714 So.2d 877 (1998)
STATE of Louisiana, Appellee,
v.
Charles BUTLER, Appellant.
No. 30798-KA.
Court of Appeal of Louisiana, Second Circuit.
June 24, 1998.
*880 Raymond Lee Cannon, Dennis G. Stewart, Peggy J. Sullivan, La. Appellate Project, Monroe, for Appellant.
Richard Ieyoub, Attorney General, James D. Caldwell, District Attorney, James E. Paxton, Assistant District Attorney, for Appellee.
Before BROWN, WILLIAMS and GASKINS, JJ.
GASKINS, Judge.
The defendant, Charles Butler, appeals his conviction for the second degree murder of his father-in-law, Jimmy Nash. For the following reasons, we affirm the conviction and sentence.

FACTS
On Sunday morning, October 29, 1995, Alma Nash dropped her daughter, Desiree, off at the home of her father, Jimmy Nash. The child was approximately eight years old and Mr. Nash frequently looked after her while Ms. Nash worked. As her mother drove away, Desiree knocked on the door and discovered that it was open. Upon entering the house, Desiree discovered the body of her grandfather in a bedroom. Mr. Nash had been stabbed numerous times. Also, his wallet was missing from his trousers, which were found lying in the middle of the hallway floor.
Desiree ran two doors down to the home of her uncle and aunt, the defendant Charles "Terry" Butler and Mrs. Gwen Nash Butler. Mrs. Butler was also a daughter of the victim.[1] The police were summoned and they determined that Mr. Nash had been murdered on the previous evening. Examination of Mr. Nash's residence revealed no signs of forced entry.
When police interviewed the defendant, he said that he last saw the victim between 5:00 and 7:00 p.m. Friday night. He and his wife had eaten dinner at the victim's and went home some time after 7:00. The defendant told police that he spent the rest of the evening at a local bar and went home at 10:15 p.m. Mrs. Butler testified that she went to bed at 9:30 and did not know when the defendant came home.
On the same day the crime was discovered, Terrance Gales contacted Tensas Parish Sheriff's Deputy Kenneth Morgan regarding the defendant. Gales told the deputy that just before 6:00 p.m. on Saturday, the defendant had asked him for crack cocaine and, when Gales said that he had no drugs, the defendant produced a .38 caliber revolver and pawned it to him for $40. Gales gave the deputy the revolver, which was later identified as the property of the victim.
Other pieces of evidence emerged as the investigation continued. Investigators learned that the victim's family members all knew that the victim routinely carried a substantial amount of cash in his wallet. The family also knew that the victim usually draped his pants, containing his wallet, over a nearby chair as he slept. Further, the family knew that Layla Butler, the defendant's daughter who usually stayed with the victim on the weekends, would not be staying in the victim's home over the weekend of the murder because she would be attending the *881 homecoming festivities at Northeast Louisiana University.
Police subsequently learned the rest of the story. Bernard Johnson testified that he drove Joseph "Crab" Wafer, Robert Barnett and Thorneial "Dough Boy" Wilmore from Tallulah to Newellton on Saturday night. While Barnett visited a nearby club, the other three men went into the house trailer of Claudine Bradford, the defendant's cousin. Wafer and Wilmore left for a while, then the four men met again and drove back to Tallulah. Johnson said that when they returned to Tallulah, he and Barnett went to a bar while Wafer and Wilmore went elsewhere. Johnson later discovered that Wafer and Wilmore had stolen his car. Johnson was unable to specify the times for these various events. Robert Barnett testified and told a similar story; he guessed that the men returned to Tallulah at "`bout 9 something or 10 something or something like that."
Claudine Bradford testified that she and the defendant sometimes smoked crack cocaine at her trailer home and that she often bought drugs from Wafer and Wilmore. She testified that the defendant was with Wafer and Wilmore at her trailer on the evening of October 28 and that the defendant bought drugs from Wafer. She said that the three men twice left her trailer that evening. The first time they left, the men returned with a quantity of drugs which they "cut up" in her children's bedroom. Bradford testified that the next time the men returned, at an unspecified time, they were with another man, Tyrone Gales.[2] Bradford said that Wafer gave her a bloody knife and two bloody shirts and told her to soak the shirts in detergent. The defendant was wearing a blue jacket zipped all the way up to the neck. She testified that the men appeared nervous and counted out $1,500 in cash. She heard Wafer say "Terry [the defendant] did it."
This witness admitted that she was a crack addict and that she had been smoking crack cocaine all that evening. She stated that she smoked crack with the defendant after the men returned with the bloody shirts and knife. She said that the men left her $150 in cash and two rocks of crack cocaine when they left. Ms. Bradford said that she threw the bloody shirts and the knife into the trash. The shirts and knife were not recovered. She testified that Wafer warned her that she would be "caught up in" the consequences if she told the authorities what she had seen. When investigators with the Tensas Parish Sheriff's Office (TPSO) contacted her, she falsely told them, among other things, that a person named "Rick" was involved.
Wilmore was called to testify, but refused on 5th Amendment grounds. Although the state indicated its intent to do so, it did not demand that Wilmore assert this privilege in front of the jury.
Tyrone Gales, an admitted dealer in crack cocaine, testified that he got a ride with a friend from Tallulah to Newellton on the evening of October 28 to sell crack cocaine. He met Wafer and Wilmore near the A & B Lounge. Gales said that Wafer and Wilmore wanted to smoke marijuana. As the three smoked marijuana, they met the defendant and then Wafer suggested that they go and "jack" (rob) someone. Gales testified that he and the others walked down the street and stopped in front of the victim's house. He said that the defendant walked up to the victim's front door and that he heard a click before the door opened as if the defendant had unlocked the door with a key.
Tyrone Gales said that as the men went into the home, Barbara Ann Sims walked up. Sims, who appears from the record to have mental problems, also entered the home. Gales testified that the defendant walked over to a drawer in the kitchen and Gales said that he heard clanking as the defendant rummaged through the contents. He testified that the defendant and Wafer then walked down the hallway toward the back of the home. Gales said that he heard a door close and then:
And I heard as if someone was putting something over Mr. Nash's face. And I heard a loud moaning sound and a punching *882 sound, as if he was getting hit or beat up or something. Then it lasted for about ten or fifteen seconds.... And at that time, they ran back down the hallway past me, Thorneial Wilmore and Barbara Sims. And it had me so paranoid that I took off too. And everybody ran.
Gales saw nothing in the hands of Wafer or the defendant and saw no blood on their clothing. The men ran back to Ms. Bradford's trailer, with Gales arriving somewhat later than the others.
Gales testified that he asked Wafer what happened, and Wafer pointed at the defendant and simply said "Terry." Gales noticed that Wafer was wearing a different shirt than he had been wearing earlier. Gales testified that he left the trailer and went back to Tallulah.
Gales was charged in connection with this crime and testified pursuant to a sentencing agreement with the state. In exchange for his testimony at this trial and at the trial of Joseph Wafer, the state agreed that Gales would receive no more than a five-year sentence. Further, at trial, Gales expressly repudiated an earlier written statement in which he claimed that he was threatened by the Sheriff into incriminating Wafer and the defendant. Gales claimed that he made this false statement, prepared by a "jailhouse lawyer" and filed with the Clerk of Court, out of fear of the defendant and Wafer and that the inmate told him that this statement would effect the release of all the defendants.
The defendant testified and denied that he was involved in the murder. He testified that his father-in-law had loaned him the pistol that he pawned to Terrance Gales. The defendant said that the victim gave him the gun for protection after a suspicious house fire burned their home to the ground. He testified that he and his ex-wife were at the victim's home from about 5:30 p.m. until about 7:30 p.m. on the night of the murder and then went home. He said that he left his home at about 9:00 p.m. to walk to a bar, met with Wafer, and then went home about 20 minutes later where he watched TV and then went to bed. He testified that he was awakened by Desiree Nash the next morning and found that his father-in-law had been murdered. The defendant claimed to have prior convictions for possession of marijuana with intent to cultivate, possession of drug paraphernalia, attempted simple escape and obstruction of justice.
The defendant was arrested for burglary related to the victim's pistol and was subsequently charged with the first degree murder of Jimmy Nash. The charge was amended to second degree murder, and the defendant went to trial in December 1996. That trial ended in a mistrial after the jury could not reach a verdict. In May 1997, the defendant was tried again for second degree murder and was convicted as charged. The defendant was ordered to serve the mandatory sentence for this offense, life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The defendant now appeals his conviction, arguing numerous assignments of error.

SUFFICIENCY OF EVIDENCE AND POST VERDICT JUDGMENT OF ACQUITTAL
The defendant argues that there was insufficient evidence presented at trial to support his conviction of second degree murder. He also argues that the trial court erred in denying his motion for post verdict judgment of acquittal, which argued that there was insufficient evidence upon which to base a conviction.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La. 1992); State v. Bosley, 29,253 (La.App.2d Cir. *883 4/2/97), 691 So.2d 347, writ denied 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Lott, 535 So.2d 963 (La.App. 2d Cir.1988).
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 5(C); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). It is the function of the trier of fact to assess credibility and resolve conflicting testimony. State v. Bonnett, 524 So.2d 932 (La.App. 2d Cir.1988), writ denied 532 So.2d 148 (La.1988); State v. Dunn, 30,346 (La.App.2d Cir. 2/25/98), 708 So.2d 512. Where the trier of fact has made a rational determination, an appellate court should not disturb it. State v. Combs, 600 So.2d 751 (La.App. 2d Cir.1992), writ denied, 604 So.2d 973 (La.1992). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (1987).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Ford, 28,724 (La.App.2d Cir. 10/30/96), 682 So.2d 847.
Regarding post verdict judgments of acquittal, La.C.Cr.P. art. 821 provides that such a motion shall be granted only if the court finds that the evidence, viewed in the light most favorable to the state, does not reasonably permit a finding of guilty.
Second degree murder is defined by La. R.S. 14:30.1 as "[t]he killing of a human being ... when the offender has a specific intent to kill or inflict great bodily harm." State v. Allen, 94-1941 (La.App. 1st Cir. 11/9/95), 664 So.2d 1264, writ denied 95-2946 (La.3/15/96), 669 So.2d 433.
Further, all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit a crime are principals. La. R.S. 14:24.
The defendant's argument regarding sufficiency of evidence focuses on the lack of physical evidence connecting him to the crime and to the alleged lack of credibility of Claudine Bradford and Tyrone Gales. The absence of physical evidence connecting the defendant to the crime was explained by the uncontradicted testimony of an eyewitness, Claudine Bradford. She testified that she took custody of two bloody shirts and a bloody knife from the perpetrators and that she threw these items in the trash. The state contacted the sanitation department in an effort to recover this evidence but learned that it had been buried in a landfill and could not be recovered.
The remaining physical evidence supported the state's case. Most significantly, investigators concluded that the assailants had not forcibly entered the victim's home. Desiree Nash testified that the door to the house was open when she knocked on it Sunday morning. This evidence was consistent with Tyrone Gales' testimony that he heard the defendant open the victim's door with a key. As the defendant's ex-wife testified, the defendant had access to her key to her father's home.
The defendant's argument to this court that Claudine Bradford and Tyrone Gales were not credible is misplaced. The credibility of witnesses is the province of the fact-finder, in this case, the jury. The jury was aware that Bradford used crack cocaine and *884 was afraid of reprisals from Joseph Wafer. Likewise, the jury heard in exhausting detail the generous terms of Tyrone Gales's plea bargain by which the state obtained his cooperation and testimony. The court accurately charged the jury that they were the sole judges of the credibility of the witnesses and that in so judging they should consider any motive a witness might have for lying. The defendant's credibility arguments were presented to and rejected by the jury, and this court may not substitute its own judgment for that of the jury in these matters.
Taken as true, the testimony presented by the state was sufficient to support the second degree murder verdict. Tyrone Gales testified that he, the defendant, Joseph Wafer and Thorneial Wilmore agreed to rob someone and then walked to the home of the victim. Gales testified that he heard the defendant open the victim's door with a key, saw the defendant rummage through a drawer and then walk back to the victim's bedroom with Joseph Wafer. Gales testified that he heard a loud "moaning and punching sound" as if the victim was being beaten and that the defendant and Wafer then fled from the victim's home. The victim was stabbed many times. Claudine Bradford testified that Wafer gave her two bloody shirts and a bloody knife and that the men counted out $1,500 in cash. The defendant knew that the victim routinely carried a large amount of cash and knew that his daughter Layla would not be in the victim's home on the night of the murder.
The defendant's arguments that there was insufficient evidence upon which to base his conviction is without merit.

VOIR DIRE
The defendant argues that the trial court erred in denying challenges for cause as to prospective jurors Tim Wilson, Robert Newman, Darryl Lance and David C. Hage based on the answers provided to the Court during voir dire, specifically as to the connection these persons had to the Tensas Parish Sheriff's Department and their inability to be fair and impartial.
This assignment of error is not argued in the defendant's brief. In his brief the defendant states:
The defendant does not wish to abandon this assignment of error. The defendant has requested that the transcript of the voir dire of these four prospective jurors be prepared and furnished. The order has been signed by the Trial Court and the transcript is in the process of being prepared. The defendant will request leave of court to file a supplemental brief as to this issue once the transcript is lodged with the Second Circuit Court of Appeal.
A partial transcript of the voir dire was filed in this court February 16, 1998. The defendant has not filed a supplemental brief. It may be that this argument has been abandoned by the defendant due to the failure to file a supplemental brief. However, because the defendant earlier specified that he does not intend to abandon this argument, it will be considered here.
At the outset, we note that there is no evidence of how many peremptory challenges the defendant exercised. A defendant who does not exhaust his peremptory challenges may complain of the erroneous denial of a challenge for cause but he must also prove, under La.C.Cr.P. art. 921, that he was prejudiced by the denial in order to obtain a reversal. By contrast, prejudice is presumed for a defendant who uses all of his peremptory challenges and is erroneously denied a challenge for cause. State v. Robertson, 92-2660 (La.01/14/94), 630 So.2d 1278. At any rate, our review of the record shows that none of the challenges for cause were wrongly denied.
Our state constitution guarantees to the defendant the "right to full voir dire examination of prospective jurors[.]" La. Const. art. 1, § 17; State v. Ellis, 28,282 (La.App.2d Cir. 6/26/96), 677 So.2d 617, writ denied 96-1991 (La.2/21/97), 688 So.2d 521. Challenges for cause are regulated by La.C.Cr.P. art. 797 which provides:
The state or the defendant may challenge a juror for cause on the ground that:
(1) The juror lacks a qualification required by law;

*885 (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.
The trial judge is vested with broad discretion in ruling on challenges for cause; his ruling will be reversed only when a review of the entire voir dire reveals an abuse of discretion. State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683; State v. Ellis, supra.
The defendant challenged prospective juror Tim Wilson for cause, however the foundation for the challenge in not included in that portion of the voir dire transcript furnished to this court. The defendant challenged Wilson "because of what his mother said. You know, she works for Britt and had strong feelings about that." It appears that Mr. Wilson's mother was employed by the sheriff's father. However, the record contains nothing regarding any statements made by Mr. Wilson's mother. Therefore, nothing in the record before us supports a challenge for cause as to this prospective juror. He expressed no bias regarding the defendant in his answers.
The remainder of the prospective jurors objected to by the defendant appeared to have relatives or friends connected with local law enforcement or were former employees of the local sheriff's office. Robert Newman stated that his son is a sergeant at the parish detention center and an employee of the TPSO. Mr. Newman said that he had not discussed the case with his son. He also considered the sheriff to be a friend. Mr. Newman said that he had been acquainted with the D.A. for about 10 years. Mr. Newman told the court that he would not allow his relationships with these persons to influence his judgment as a juror.
Darryl Lance stated that a relative of his worked at the parish detention center as a transportation van driver. Mr. Lance said that this relationship would not affect his performance as a juror, and the court properly rejected the defendant's challenge for cause on that ground.
David Hage stated that he had once been a deputy sheriff; he worked for the TPSO from 1970 until 1978. He knew most of the deputies who would be testifying at this trial but repeatedly said that he could be a fair juror and would not be biased toward the prosecution because of his acquaintance with the deputies.
Previous associations with either law enforcement agencies or personnel will not alone disqualify a prospective juror from service. Nevertheless, such associations should be closely scrutinized by the trial court and the appellate court. State v. Jones, 474 So.2d 919 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). Thus, the question presented is whether the prospective juror can assess the credibility of each witness independent of his relationship to law enforcement. This determination is within the great discretion of the trial court, and will not be overturned absent an abuse of that discretion. State v. Smith, 430 So.2d 31 (La.1983).
Also, people with prior law enforcement connections are competent to serve on a criminal jury. State v. Henderson, 566 So.2d 1098 (La.App. 2d Cir.1990), and cases cited therein. The linchpin is whether the prospective juror's position might have produced relationships or attitudes that would disqualify him as a juror and disqualification must be brought out on voir dire and shown on the record. State v. Henderson, supra.
None of these prospective jurors answered voir dire questions in such a way as to merit *886 a challenge for cause under La.C.Cr.P. art. 797. Therefore, even if the defendant used all of his peremptory challenges, the trial court committed no reversible error in its rulings pertaining to these prospective jurors. This assignment of error is without merit.

INCULPATORY STATEMENT
The defendant argues that the trial court erred in admitting as an inculpatory statement a remark made by the defendant about the victim, prior to this offense. For the following reasons we find that no reversible error occurred.
Several months before his death, the victim suffered a heart attack. In talking about his father-in-law with two of his co-workers, Alonzo Ransom and Richard Dunmore, the defendant stated in effect that he thought he had it made and that "he thought the son-of-a-bitch was going to die."
Prior to trial and pursuant to La.C.Cr.P. art. 768, the prosecution notified the defendant that it intended to introduce evidence of an inculpatory statement by the defendant that he thought his troubles were over because of the possibility that Mr. Nash might die of heart trouble. Prior to the testimony of Mr. Ransom and Mr. Dunmore, the defendant objected on the grounds the statement was inadmissible hearsay. The trial court overruled the objection and the witnesses were allowed to testify regarding the defendant's statement.
On appeal, the defendant argues that the statement was inadmissible because it was not inculpatory. He argues that the jurisprudence construing La.C.Cr.P. art. 768 requires that inculpatory statements must be made after the commission of a crime. In State v. Lewis, 416 So.2d 921 (La.1982), the court stated that the term "inculpatory statement" refers to the defendant's out of court admission made after a crime has taken place which implicates the defendant in its commission.
The prosecution concedes in its brief that the statement might not have been an inculpatory statement but contends that the statement was admissible to show the defendant's identity, motive and intent. Whether inculpatory or not, we find that the statement was properly admissible because it was not hearsay and was relevant.
La. C.E. art. 801(D)(2)(a), provides:
(D) A statement is not hearsay if:
(2) The statement is offered against a party and is:
(A) His own statement, in either his individual or representative capacity.
This statement, offered by the state against the defendant, was made by the defendant in his individual capacity. Accordingly, this statement was not hearsay and was admissible. State v. Huff, 27,212 (La.App.8/23/95), 660 So.2d 529, writ denied 96-0212 (La.5/1/97), 693 So.2d 754. Therefore, even though the trial court admitted the statement for the wrong reason, the statement was admissible and no error occurred.

OTHER CRIMES EVIDENCE
The defendant argues that the trial court erred in admitting other crimes evidence relating to drug use, spousal abuse, abuse of women other than his wife, and the theft of a pistol from the victim. The defendant also argues that the trial court erred in denying his request for a Prieur hearing as to the admissibility of other crimes evidence. These arguments are without merit.
The trial court did not deny the defendant a hearing on the admissibility of other crimes evidence. We note that State v. Prieur, 277 So.2d 126 (La.1973) does not require a pretrial evidentiary hearing. It only requires that before such evidence is introduced, the trial court must determine, on the basis of the showing requisite for it to do so at a hearing outside the presence of the jury, that the extraneous acts are probative of a real issue and that their probative value exceeds their prejudicial effect. State v. Lukefahr, 363 So.2d 661 (La.1978), writ denied 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241; State v. Moore, 498 So.2d 82 (La.App. 5th Cir.1986). The record shows that the trial court considered the defendant's arguments regarding the admissibility of other crimes evidence prior to trial.
*887 This record contains two written motions by the defendant requesting a Prieur hearing. The first motion was filed on November 13, 1996, before the first trial commenced on December 9, 1996. This motion requested a hearing on the evidence pertaining to the defendant's drug use and the defendant's possession of the victim's gun. At the commencement of the first trial, the trial court heard arguments on the issues and ruled that the gun evidence was res gestae and that the drug evidence would be considered on a witness-by-witness basis.
The minutes for May 14, 1997, show that the defendant made an oral motion for a Prieur hearing but that the trial court denied the motion as unnecessary because "the evidence offered was part and parcel of the alleged criminal offense."
The defendant's second written motion was filed on May 20, 1997. This motion included the drug and gun evidence and added a request for a hearing on spousal abuse. The minutes for May 20 reflect that the court again heard arguments on all three issues, decided that the drug and gun evidence was res gestae and ruled that the spousal abuse evidence would be admissible to show the relationship between the defendant and the victim.
None of the defendant's motions for a Prieur hearing requested the exclusion of the now complained of evidence, that is to say he filed no motion in limine. The record also does not reflect that the defendant objected to the scope and nature of the consideration the court gave the question. The denial of a written motion may be challenged on appeal even in the absence of an objection to the ruling, but here the court allowed argument on the issue in the nature of a Prieur hearing and the defendant requested nothing further. We also note that the same judge presided over both of the defendant's trials and was familiar with the issues involved.
Most significantly, the record does not reflect that the defendant objected to the court's ruling allowing the limited admission of the evidence in question. With no written motion to exclude the evidence and no objection, the defendant is limited on appeal to those matters objected to during the trial. La.C.Cr.P. art. 841.
Further, the record does not support the defendant's claim that the other crimes evidence was improperly admitted. La. C.E. art. 404(B) provides:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
A trial court's ruling on the admissibility of other crimes will not be overturned absent an abuse of discretion. State v. Blackwell, 30,281 (La.App.2d Cir. 11/10/97), 701 So.2d 1389, writ denied 97-3073 (La.2/13/98), 709 So.2d 755.
The evidence of spousal abuse was first presented to the jury through the testimony of the defendant's daughter Layla Butler. The state asked Ms. Butler about the nature of the relationship between her father and the victim:
Q: In describing the relationship, if you had to say whether it was a good relationship or a bad relationship, how would you describe it?
....
A: Bad.
Q: Okay. Do you have any personal knowledge of why that would've been?
A: Because my father abused my mother.
Q: Okay. Youyou spent a lot of time with your grandfather, obviously, if you lived with him, correct?
A: Yes.

*888 Q: And I take it from your statement, then implied, is that your grandfather knew about this situation, is that correct?
A: Yes, sir.
Nowhere in this colloquy is there an objection by the defendant to the witness' testimony about spousal abuse.
The next evidence came from the defendant's ex-wife herself:
Q: During your marriage to the defendant and during the time in question that we're talking about, what was the relationship between the defendant and your father?
A: I'd just say tolerable.
Q: When by tolerable you meanwell, tell me what you mean by tolerable?
A: What I mean, they didn't like each other basically. They just tolerated each other.
Q: Do you have an idea or do you or have you personal knowledge of what basis was for the relationship that existed between them?
A: Basically, my daddy didn't like him because he beat up on me.
Q: There had been some physical abuse?
A: Yes, it had been.
Q: Okay. Had there been any other there been any mental abuse?
A: Yes.
Q: Well, Ms. Butler you were married to the defendant for twenty-three years. If there had been such physical abuse and mental abuse, why did you remain with him for twenty-three years of marriage?
A: I had three kids.
Q: So out of concern for your children you stayed in the marriage?
A: Yes, I did.
Q: Did you have any intentintention to divorce the defendant at some point in the marriage?
A: Yes, I did.
Q: Okay. And you've actually done that today, is that correct?
A: That's correct.
Q: Did your father, I take it from your testimony then that your father did have knowledge of the fact that you had been in an abusive situation, is that correct?
A: That's correct.
The defendant objected to none of this testimony. On cross-examination, the defendant asked this question:
Q: Now did you ever file any complaint with the police department about being beaten?
A: No, I did not.
On cross-examination, the state asked the defendant about the abuse:
Q: You described ups and downs in your marriage. And you've heard the testimony in this court from your wife, that you physically abused her, is that true?
A: Well, it depends on your definition of physical abuse.
Q: Well, what is your definition?
A: Well, you know, physical abuse got to come into degrees, I would suspect. If you were to slap someone, that's physical abuse.
Q: Have you ever slapped your wife?
A: Yes, I have.
Q: Okay. Do you call that physical abuse?
A: Yes, I do.
Q: Okay. Have you ever abused anyone else?
A: No.
The defendant objected to none of this questioning.
With no objection to the questioning, and the state's careful use of the evidence for the limited but relevant purpose of illustrating the relationship between the defendant and the victim, the defendant's complaint regarding this evidence is without merit.
Regarding the victim's revolver, Terrance Gales testified that the defendant pawned a revolver, which was proven to be the victim's, for $40 on the day of the murder. As with the spousal abuse evidence, the defendant made no objection to Gales' testimony or to the introduction of the gun into evidence. Even if the gun was not part of the res gestae of the murder, it was strongly relevant for purposes other than showing the defendant to be a person of bad character. *889 First, the police developed the defendant as a suspect in this case because he pawned the gun to Terrance Gales. The close proximity in time of this transaction to the murder was the first break in the investigation that led to this prosecution and helped the jury to understand how the police came to suspect the defendant as the killer.
Second, as the state points out, the evidence that the defendant took a handgun from the victim's home tends to show that the defendant took actions to put the victim in a more helpless position. This contention is weakened somewhat by the evidence that the victim kept the weapon in a bedroom other than his own and that the victim had four handguns but nevertheless the jury was entitled to know that the defendant had taken one of the defendant's weapons. The defendant's own daughter testified that the victim would "by no means" have loaned the defendant a gun as the defendant claimed. This complaint is also without merit.
The evidence regarding the defendant's drug use was pertinent to establish a motive for this offense. The defendant was shown to be a drug user who needed money to purchase drugs. As indicated by the district court at the first trial, the admissibility of this evidence is dependent on the particular witness giving that evidence. The first witness to raise this issue was Terrance Gales. He testified that he met the defendant just before 6:00 p.m. on the night of the murder and that the defendant asked him if he had any crack cocaine. The defendant had no objection to this testimony which showed that the defendant was looking for crack only a few hours before the victim was killed.
The next witness testifying about the defendant's drug use was his ex-wife. She said that both she and the defendant used crack cocaine and that Tyrone Gales and Joseph Wafer both sold rocks of crack cocaine. The focus of this testimony, which was not detailed, was not to show that the defendant was a bad person because he used crack, but instead tied the defendant's crack use to Wafer and Tyrone Gales, both of whom were with the defendant on the night of the murder. This testimony built on Terrance Gales' testimony to show that the defendant's association with those persons on the night of the murder was motivated in part by his search for crack cocaine. The defendant's cross-examination of this witness on this point was arguably less relevant and more damaging in that he asked the witness how long she and the defendant had been using drugs.
The next witness on this issue was Claudine Bradford. Bradford testified that the defendant had smoked crack with her in the past and that he bought crack from Joseph Wafer at her house the evening of the murder. She went on to describe how the defendant, Wilmore and Wafer came and went from her home that night, how they brought her two bloody shirts and a bloody knife and that at the same time the defendant asked her for a "pipe so he could smoke" and that she and the defendant in fact smoked crack at this time.
This evidence ties in with the earlier testimony to show that the defendant used crack, was looking for crack just before the murder and was smoking crack shortly after the murder. Indeed, Bradford testified that the men left her two rocks of crack, as well as money, when they left her home.
This is underscored by the testimony of Tyrone Gales. He admitted that he came to Newellton to "make some money selling crack cocaine." Indeed, he intended to sell crack to the defendant as he had done in the past. Tyrone Gales saw the defendant meet Wafer and Wilmore, both crack dealers, according to Tyrone Gales, and immediately they asked him whether he wanted to help them "jack" (rob) someone.
The circumstances of this offense are inextricably intertwined with the defendant's search for crack and association with crack dealers. Crack use supplies one reason for the defendant's pawning of the victim's gun and provides the primary reason for his meeting with Wafer, Wilmore and Tyrone Gales. All of the described events took place over a few hours, and at the conclusion of this episode the defendant smoked crack with Ms. Bradford. Overall, the thrust of the evidence of the defendant's drug use went to the one likely motive for the defendant to *890 commit this terrible crime, his search for money to buy drugs. This motive, while not an element of the crime, was important in this case to show how a relationship which was merely "tolerable" could evolve into a heinous murder.
Because of the lack of objection to the testimony about the defendant's drug use, because this evidence was probative of genuinely contested questions and because these questions are proper subjects of inquiry under La. C.E. art. 404(B)(1) to show the defendant's motive for the crime, the defendant's complaint in this regard is without merit.
Accordingly, these assignments of error are without merit.

LIMITATION OF CROSS EXAMINATION
The defendant argues that the trial court erred in refusing to allow him to cross examine one of the prosecution's witnesses, Terrance Gales, regarding any charges pending against him. He also argues that the trial court erred in preventing him from questioning the victim's daughter, Alma Nash, and Deputy Karl Jones, regarding whether they had a romantic relationship. The defendant contends that this questioning was necessary to show bias or interest on the part of these witnesses. These arguments are without merit.
After learning that Terrance Gales had not recently been employed, the defendant asked him whether he had any pending criminal charges. The witness responded that he did, and the defendant then began to ask about the details of the charges. The state then objected to this line of questioning on the grounds that only final convictions, not pending charges, were the proper grounds for impeachment. After argument, the court allowed the defendant to ask the witness whether he had made any deal with the state in connection with his testimony but refused to allow the defendant to ask the witness about his pending charges and directed the jury to disregard that question. The defendant entered an objection to the limitation of his cross-examination.
La. C.E. art. 609.1 provides, in pertinent part:
A. General criminal rule. In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.
B. Convictions. Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.
This article was the source of the state's objection; generally, inquiry into arrests is not proper. However, this general rule gives way when a witness has pending charges against him and the cross-examiner seeks to show the fact finder that these pending charges may bias or influence the testimony of the witness. See, e.g., State v. Vale, 95-1230 (La.01/26/96), 666 So.2d 1070. The Vale court said:
[T]o the extent exposure of a witness's motivation is a proper and important function of the constitutionally protected right of cross-examination, a witness's "hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest." State v. Brady, 381 So.2d 819, 822 (La.1980) (collecting cases); see also State v. Nash, 475 So.2d 752, 755-56 (La.1985). A witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct.
This is a well-established rule. See also State v. Webb, 97-1704 (La.12/12/97), 704 So.2d 240; State v. Williams, 618 So.2d 606 (La.App. 2d Cir.1993), writ denied, 625 So.2d 1060 (La.1993). To some extent, the possibility that Terrance Gales' testimony was biased or motivated by the hope of receiving leniency was answered by questioning which showed that he had not made a deal with the prosecution in exchange for his testimony in this case.
*891 However, even if we found that the trial court improperly limited questioning of this witness, any error that occurred is harmless. Confrontation errors are subject to harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); State v. Vale, supra; State v. Williams, supra. As the Van Arsdall court said:
Accordingly, we hold that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontational Clause errors, is subject to Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)] harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony on material points, the extent of cross examination otherwise permitted, and, of course, the overall strength of the prosecution's case. [Citations omitted.]
See also State v. Hawkins, 96-0766 (La.01/14/97), 688 So.2d 473.
The bulk of Terrance Gales' testimony was, as the state points out, cumulative. Deputy Morgan testified that Terrance gave him the victim's pistol the day after the murder and told him that the defendant had given him the gun in exchange for something. The defendant admitted pawning the gun to Terrance Gales, corroborating the story in most aspects. The evidence of the defendant's drug use on the day of the murder was brought out through Ms. Bradford. Because Terrance Gales' testimony was largely cumulative, it was not of great significance in the prosecution's case, and the jury was made aware that the witness was not testifying pursuant to a deal with the state.
Therefore, even if the limitation of questioning of Terrance was error, the error was harmless beyond a reasonable doubt.
The defendant also argues that the trial court erred in limiting his cross-examination of the victim's daughter, Alma Nash, and the chief deputy of the TPSO, Karl P. Jones. The defendant sought to introduce evidence that these two were romantically involved, evidently in an effort to show their bias. The court sustained the state's objections to this testimony. The record does not reflect an objection by the defendant to the limitation of Ms. Nash's testimony, but the exchange between defense counsel and the court regarding Ms. Nash was cut short and is not fully reported in the record. The defendant objected in part to the limitation of his questioning of Deputy Jones.
Reviewing the record as a whole, it is apparent that the testimony of these witnesses was not critical to the state's case. The defendant's daughter Layla Nash testified that the victim routinely carried cash in his wallet which was usually in his pants on a nearby chair at night. She and other family members testified that the defendant and the victim did not have a good relationship. These items were the high points of Alma Nash's testimony. Further, the defendant did elicit from Alma Nash that she was a "close friend" of Deputy Karl Jones.
As for Deputy Jones, this witness was not part of the state's case in chief; rather, the deputy was the defendant's witness. The defendant established that the deputy was close friends not only with Alma Nash but also with Gwen Butler, the defendant's wife. The deputy also testified that "the person who really opened the case up" was Claudine Bradford, and there is no evidence that the deputy was friends with that witness.
In short, there is little evidence that the sought-after information would have been relevant to show bias beyond that which was elicited by the defendant. Therefore, even if exclusion of this testimony was error, the error was harmless beyond a reasonable doubt.

*892 MOTION FOR NEW TRIAL
The defendant argues that the trial court erred in denying his motion for new trial which alleged that improper contact occurred between a juror and a sheriff's deputy. For the following reasons, we find that the trial court did not err in denying this motion for new trial.
The defendant made a motion for new trial, both in proper person and through counsel. The district court denied the motion. From the many arguments included in that motion, he argues but one on appeal.
From the defendant's motion:
Defendant has discovered, since the verdict of guilty in this case a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment in the following particular, Tensas Parish Sheriff's Deputy Jack McMillian was transporting a petit juror, Mr. Powell, back and forth to Tensas Parish Courthouse. Tensas Parish Sheriff's Deputy Jack McMillian was also dating and living with Alma Nash, a witness at this trial and the daughter of the decedent, all during the time that he was transporting Mr. Powell back and forth as a juror in this trial.
The trial court considered these allegations, ruled that no evidentiary hearing was warranted and denied the motion for new trial, stating:
The allegations that Mr. Powell was transported to the courthouse by [sic] Deputy Sheriff who had a relationship with a witness is simply a bare allegation of contact and no allegation of wrongdoing on [sic] part of anyone. And the Court does not wish to participate in a fishing expedition with respect to these witnesses, and does not think it's appropriate to put any of the witnesses through that, particularly someone who has offered themselves for service on a jury and has served on a jury.... The Court feels that the defendant did receive a fair trial. The Court is not of the opinion that justice would be served by the granting of a new trial.
It does not appear from the record that the jury was sequestered during the trial. La. C.Cr.P. art. 791. The index reveals no motion to sequester by either party nor does the record reveal that either party orally requested sequestration. As always in a non-capital case, even if such a motion were filed, the trial court has the discretion to decide whether or not to sequester the jury. State v. Williams, 445 So.2d 1171, 1176 (La.1984).
The pertinent evidence article is La. C.E. art. 606 B, which provides:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes. [Emphasis added.]
Comment (c) to this article states:
In embracing for criminal cases the exceptions to the general testimonial juror disqualification rule contained in Federal Rule of Evidence 606(b), this Article rejects the approach taken in former R.S. 15:470 and R.S. 15:471 of attempting to prohibit all testimony by jurors impeaching their verdicts.
In State v. Harris, 597 So.2d 163, (La.App. 2d Cir.1992), this court said:
This article [La. C.E. art. 606(B)] clarifies the previous jury shield law, La. R.S. 15:470, but does not change the requirements for overcoming the prohibition against juror testimony. Therefore, the prior jurisprudence remains applicable. State v. Duncan, 563 So.2d 1269 (La.App. 1st Cir.1990).

*893 The prohibition contained in Articles 606(B), and previously set forth in LSA-R.S. 15:470, is intended to preserve the finality of jury verdicts and the confidentiality of discussions among jurors. State v. Sanders, 539 So.2d 114 (La.App. 2d Cir. 1989), writ denied, 546 So.2d 1212 (La. 1989); State v. Morris, 457 So.2d 119 (La. App. 2d Cir.1984). Only well pleaded allegations of prejudicial juror misconduct violating a defendant's constitutional rights will require an evidentiary hearing at which jurors shall testify. State v. Graham, 422 So.2d 123 (La.1982); State v. Sanders, supra; State v. Morris, supra. Unless such pleadings are made with particularity, jury members are not competent to testify. State v. Sanders, supra. [Emphasis supplied.]
See also State v. Horne, 28,327 (La.App.2d Cir. 08/21/96), 679 So.2d 953, writ denied 96-2345 (La.02/21/97), 688 So.2d 521.
The threshold question in this case is whether the trial court erred in finding the defendant's allegations of juror misconduct to be insufficient to merit a hearing. We find that it did not.
In State v. Sanders, cited in Harris, supra, the trial court ruled insufficient a defendant's allegation, inter alia, that one juror slept through deliberations and was awakened by another juror with the exhortation to wake up and vote guilty so she could "go home and go to bed." On appeal, this court stated that the defendant's allegation was specific but "there are nevertheless no facts pleaded which indicate that [the juror] was unwillingly induced to vote guilty." State v. Sanders, supra.
In State v. Morris, also cited in Harris, supra, this court rejected a defendant's challenge to the trial court's refusal to hold a hearing where the allegations of misconduct pertained to the jury's deliberations about the defendant's failure to testify and the defendant's multiple offender status. We held the defendant failed "to allege with particularity the basis for his contention that there has been jury misconduct in the nature of constitutional violations that created a reasonable possibility of prejudice."
Both Sanders and Morris pertained to juror conduct within the confines of the jury's deliberations. See also State v. Graham, supra, where the court rejected a defendant's complaint that he was prejudiced when a juror conducted a blood coagulation experiment during deliberations, and State v. Stewart, 530 So.2d 1263 (La.App. 2d Cir. 1988), where this court affirmed the denial of an evidentiary hearing on a complaint that jurors discussed the case before deliberations began.
These cases, in which the defendant alleges misconduct among the jurors, are distinguished from cases where the defendant alleges misconduct involving an extraneous influence. State v. Sinegal, 393 So.2d 684 (La.1981); State v. Horne, supra; State v. Cantu, 469 So.2d 1083 (La.App. 2d Cir. 1985). As this court stated in State v. McLemore, 26, 106 (La.App.2d Cir. 06/24/94), 640 So.2d 847, 859, writ denied, 94-1908 (La.12/09/94), 647 So.2d 1107, U.S. cert. denied, 514 U.S. 1116, 115 S.Ct. 1974, 131 L.Ed.2d 863 (1995):
[A]ny unauthorized communication, contact, or tampering directly or indirectly, made by a nonjuror with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial, if not made in accordance with rules of court and the instructions and directions of the court made during the trial, with full knowledge of all the parties. The presumption is not conclusive, but the burden rests heavily upon the state to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to defendant. [Citations omitted.] Prejudice may be shown by evidence that an extrinsic factual matter tainted the jury's deliberations. Thus, an adequate demonstration of extrinsic influence upon the jury overcomes the presumption of jury impartiality and shifts the burden to the state to show that the influence demonstrated was not prejudicial.
See also State v. Duplissey, 550 So.2d 590 (La.1989), where the Louisiana Supreme Court reversed a defendant's conviction because of evidence that the jury had spoken with a bailiff about the process of deliberation. *894 In that case, the court collected other cases where reversal and new trial were warranted due to the extraneous influence of a court official.
The allegedly improper conduct in this case involved only the possibility of communication between a juror and a deputy sheriff who may have had a personal relationship with a witness who was the daughter of the victim. In this case, there are no well pleaded allegations of prejudicial juror misconduct violating the defendant's rights. The defendant has not alleged that any unauthorized communication, contact or tampering by the deputy with the juror occurred in this case. The only allegation is that the deputy drove the juror to court. There is no allegation that anything at all regarding this case was discussed between the parties or any improper influence was brought to bear upon the juror in his deliberations. Because the defendant has failed in this case to provide the trial court with well-pleaded allegations of juror misconduct, the trial court did not err in denying the request for an evidentiary hearing on this matter and in denying the motion for new trial.

DENIAL OF TRANSCRIPT
The defendant argues that the trial court erred in denying his request for a transcript of the first trial held in this matter on December 19, 1996. That proceeding ended in a mistrial. This argument is without merit.
After the defendant's first trial in December 1996 ended in a mistrial because the jury was unable to reach a verdict, on January 31, 1997, the defendant filed a written motion for a transcript of that trial. According to the motion, the second trial was scheduled for the week of March 24-28, 1997. According to the minutes for February 27, 1997, the court ordered that a transcript be prepared.
The minute entry for May 14, 1997, provides, in pertinent part:
Defense counsel expressed his wish to obtain a transcript of the December trial with this Court's decision being that there is not ample time to do so and therefore [sic] is deniedto which decision defense counsel Raymond Cannon agrees. [Emphasis added.]
On appeal, the defendant complains that he should have been provided with a transcript of the previous trial and that the court's failure to do so is reversible error. The state must provide an indigent defendant with a transcript of prior proceedings when needed for an effective defense. Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971); State v. Davis, 568 So.2d 190, 195 (La.App. 2d Cir.1990), writ denied, 572 So.2d 62 (La.1991). Defendant argues that his acquiescence in the court's order and failure to seek a continuance should not bar him from raising this issue on appeal because he had been in jail on this matter since October 1995, and that the court's denial forced him to balance his right to a speedy trial against his right to the transcript. The state argues that the defendant waived the issue because of his acquiescence in the court's ruling.
Generally, to preserve an issue for appeal, a party need not enter a contemporaneous objection to the court's ruling on a written motion. La.C.Cr.P. art. 841(B). However, a party may not expressly agree to an adverse ruling, even on a written motion, and subsequently complain that the ruling was in error. The purpose of the requirement for an objection to a ruling by the court is to put the court on notice of a potential problem and to allow the court to correct it before it "infects the entire proceeding." State v. Potter, 591 So.2d 1166 (La.1991). A written motion accomplishes the same purpose as an objection by putting the court on notice of a potential problem. However, that identity of function between motion and objection is lost when the party filing the written motion abandons the complaint raised therein, as was the case here. Waiver of a matter asserted in a written motion relieves the trial court from further consideration of the issue unless and until it is raised anew.
Further, this court should decline to second-guess the motives or strategy of a party in taking a particular course of action with regard to pre-trial preparations. At this second trial, the defendant was represented by the same attorney who represented him at the first trial, and the same judge presided *895 over both trials. Although part of counsel's calculus in acquiescing to the ruling might have been concern for the speed of the proceedings, it is equally likely that counsel judged the transcript unnecessary for an effective defense in light of the above factors.
This assignment of error is without merit.

ERROR PATENT
We have examined the record for errors patent on the face of the record and have found none.[3]

CONCLUSION
For the reasons stated above, we affirm the conviction and sentence of the defendant, Charles Butler.
AFFIRMED.
NOTES
[1] Mrs. Butler divorced the defendant before the trial began.
[2] For the sake of clarity, it should be noted that Terrance Gales, mentioned earlier, and Tyrone Gales, referred to here, are not the same person.
[3] The defendant, in Assignment of Error No. 7, alleged that the trial court erred in allowing the admission of hearsay testimony during the course of the trial for truth of the matter that the defendant did in fact commit the murder in question. In his brief, the defendant stipulates that the alleged hearsay testimony was not objected to and thus is not properly before this court for review.

The defendant also stipulates in his brief that Assignment of Error No. 8, alleging that the trial court erred in denying motions to suppress identification of the, stating that the motion to suppress was filed in the case of State v. Joseph Wafer and does not apply to this appeal.
Therefore, these assignments of error are considered abandoned.