# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 23-697


## STATE OF LOUISIANA

## VERSUS

## EXZAVIAN BURNETTE


**\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, DOCKET NO. 231,441
HONORABLE KERRY LYNDON SPRUILL, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


**JONATHAN W. PERRY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Jonathan W. Perry, Ledricka J. Thierry, and Guy E. Bradberry, Judges.


**CONVICTIONS AFFIRMED. SENTENCES AFFIRMED.**
**REMANDED WITH INSTRUCTIONS.**

Chad M. Ikerd
Louisiana Appellate Project
P. O. Box 2125
Lafayette, Louisiana 70502-2125
(225) 806-2930
**COUNSEL FOR DEFENDANT/APPELLANT:**
    Exzavian Burnette

Exzavian Burnette
Pro Se
Camp "D" #779278
Louisiana State Penitentiary
17544 Tunica Trace
Angola, Louisiana 70712

Charles Riddle
District Attorney, Parish of Avoyelles
Jonathan Gaspard
Jenny Donaghey
Emily Bertholl
Assistant District Attorneys
P. O. Box 1200
Marksville, Louisiana 71351
(318) 253-6587
**COUNSEL FOR APPELLEE:**
    State of Louisiana

**PERRY, Judge.**

Defendant, Exzavian Burnette, appeals his convictions on two counts of a responsive verdict, principal to second degree murder. For the following reasons, we affirm Defendant's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

The facts of this case involve rival gangs in Bunkie, Louisiana, the Bentley Boys and Three World. On January 19, 2022, there were two shootings at 110 North Knoll Street: one at about 9:00 a.m. and one at dusk. In the first, Devondrey Carter ("Carter") and Delton Hamilton ("Hamilton"),[1] two brothers affiliated with the Bentley Boys, got into a verbal argument with Devonte Pierre ("Pierre")[2] and Kevin Armstrong ("Armstrong"), two members of Three World. Initially, the verbal altercation was between Hamilton and Pierre. Without warning, Carter exited the house, came down the driveway, and started shooting at Pierre, a friend of Defendant. As Pierre and Hamilton retreated, Carter shot Pierre in the left wrist.

Near dusk on that same day, Layla Leary ("Ms. Leary"), Carter's cousin, saw several individuals walking toward 110 North Knoll Street as she and several others drove by about fifteen minutes before the second shooting occurred. Ms. Leary testified that one of the four individuals turned to look back as she and the others drove by them; she identified Defendant as one of the individuals dressed in black. Minutes later, shots were fired from the direction in which Defendant and the three other individuals were travelling. Hamilton was shot in the left chest. Carter also had gunshot wounds on his left chest, left hip, upper buttocks, and lower leg. After

---

[1] The spelling of most names in the record is confusing and not consistent. Sometimes Devonte Carter is referred to as Devondrey Carter and Delton as Dalton Hamilton. For consistency, we have used the names stated in the bill of indictment, namely, Devondrey Carter and Delton Hamilton.

[2] At times in the record, Devonte Pierre is referred to as Devontarious Pierre or Devontraious Pierre.

being shot, Hamilton ran toward Ms. Leary. As he lay dying in the street, he said to her, "He shot me, he shot me. Zay shot me." Ms. Leary testified that she had known Defendant her entire life and that he was commonly referred to as "Zay." Both Hamilton and Carter died from wounds received in the shooting.

On May 19, 2022, an Avoyelles Parish grand jury returned a bill of indictment, charging Defendant with two counts of first degree murder, a violation of La.R.S. 14:30. On December 22, 2022, the State amended the bill of indictment and charged Defendant with two counts of principal to first degree murder, a violation of La.R.S. 14:24 and 14:30.1. On December 7, 2022, a jury unanimously found Defendant guilty of two counts of the responsive verdict, principal to second degree murder.

On March 21, 2023, Defendant, through counsel, filed a motion for new trial, arguing that his jury was drawn from a general venire that illegally excluded persons convicted of felonies and that the verdict was contrary to the evidence presented at trial. The same day, Defendant also filed a motion for post-verdict judgment of acquittal, arguing that the evidence contained in the record was insufficient to support his convictions. The trial court denied Defendant's motions.

On May 17, 2023, the trial court sentenced Defendant to mandatory life imprisonment at hard labor without probation or suspension for each count of principal to second degree murder. However, as required by La.R.S. 15:574.4(F), the trial court afforded Defendant the benefit of parole consideration because he was under the age of eighteen at the time he committed the offenses.

Defendant timely appealed his conviction, asserting one counseled assignment of error and two pro se assignments of error.

## COUNSELED ASSIGNMENT OF ERROR

Appellate counsel contends that the State failed to prove that Defendant was guilty of two counts of principal to second degree murder.

## PRO SE ASSIGNMENTS OF ERROR

1. Prosecutorial Misconduct: Presentation of inadmissible hearsay, without a valid firmly rooted exception to the hearsay rule.

2. Prosecutorial Misconduct: The prosecutor knowingly used perjured testimony to secure a conviction in violation of due process of law.

## ERRORS PATENT REVIEW

In accordance with La.Code Crim.P. art. 920, we review all appeals for errors patent on the face of the record.

Our careful review of the record shows the trial court inadequately advised Defendant about the time for filing post conviction relief. The trial court stated:

> I inform you that no application for post conviction relief shall be considered, you must file more than two years after the judgment of conviction and sentence has become final except in very limited situations as law [sic].

Louisiana Code of Criminal Procedure Article 930.8 requires the trial court to inform a defendant at sentencing either verbally or in writing that he has two years "after the conviction and sentence has become final" to seek post conviction relief. *See State v. Green*, 21-14, 21-15, p. 4 (La.App. 3 Cir. 10/27/21), 329 So.3d 917, 921. Accordingly, the trial court is instructed to inform Defendant of the correct provisions of article 930.8 by sending appropriate written notice to him within ten (10) days of the rendition of this opinion and to file written proof that Defendant received the notice in the record of the proceedings. *Id.*

In a second matter, our review of the record shows that the placement of the minute entries makes it appear as though Defendant's post-verdict motions for new trial and post-verdict judgment of acquittal were ruled upon after Defendant's sentencing. Nevertheless, the transcript shows that Defendant's post-trial motions were heard and ruled upon before sentencing, a requirement of La.Code Crim.P. arts. 853 and 861. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Womack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365,

369, *writ denied*, 00-2051 (La. 9/21/01), 979 So.2d 62. Additionally, in conformity with La.Code Crim.P. art. 873, Defendant waived the twenty-four hour delay between the trial court's ruling on his post-trial motions and sentencing.

Lastly and to thoroughly examine every possible errors patent, we have closely read the trial court's statement regarding diminution of sentence. After imposing the sentences, the trial court stated the following to Defendant: "I inform you that the crimes which you've been convicted here today are crimes of violence as defined in the law, which the sentencing imposed are accordingly not subject to diminution for good behavior[.]"

This court has stated the following regarding the trial court's authority to deny diminution of sentence:

> We first address whether the trial court "denied" diminution of sentence. Such a denial by the trial court would constitute error as the supreme court has held that the provisions of La.R.S. 15:537(A), which prohibits diminution of sentence for certain sex offenders, and the provisions of La.R.S. 15:571.3, which sets forth the guidelines for diminution of sentence for all prisoners, do not form part of the sentence. *State v. Prejean*, 08-1192 (La. 2/6/09), 999 So.2d 1135 (per curiam). The guidelines are instead directives to the Department of Corrections in computing an inmate's sentence. *Id. See also State v. Fallon*, 15-1116, p. 4 (La.App. 3 Cir. 4/6/16), 189 So.3d 605. Both the supreme court and this court have repeatedly stated that trial judges lack authority to deny diminution of sentence. *See State v. Narcisse*, 97-3161 (La. 6/26/98), 714 So.2d 698; *Fallon*, 189 So.3d 605. In cases in which the trial court has been found to deny diminution sentence [sic], this court has corrected the sentencing error. *See, e.g., State v. Davis*, 19-562 (La.App. 3 Cir 2/5/20), 291 So.3d 246, *writ granted on other grounds*, 20-392 (La. 6/3/20), 296 So.3d 1041; *Fallon*, 189 So.3d 605.

*State v. Monceaux*, 22-28, p. 6 (La.App. 3 Cir. 6/1/22), 340 So.3d 201, 206.

The trial court in *Monceaux* stated the following at sentencing: "Under 15:571.3, is the defendant subject to diminution for good behavior[?] It's the Court's position he is not." *Id.* After reviewing the trial court's statement and considering the jurisprudence, we found the trial court's statement regarding diminution of sentence was merely an advisement that did not need correction.

4

Considering the analysis detailed in *Monceaux* and more particularly that reported in *State v. Watson*, 21-725, p. 7 (La.App. 3 Cir. 4/27/22), 338 So.3d 95, 100, where this court found the trial court's statement "[t]hese sentences are crimes of violence and are not subject to diminution for good behavior" was merely advisory, we conclude that the trial court's statement in the present case did not constitute an impermissible denial of the diminution of sentence.

## Sufficiency of the Evidence

### Defendant's Argument

Defendant contends the State failed to sufficiently prove that he was guilty of two counts of principal to second degree murder. Defendant argues there were no eyewitnesses to the shooting, no video surveillance capturing the shooting, no confession made by him, nor was there any forensic evidence tying anyone, particularly him, to the gun used to shoot the victims. Defendant claims the State presented circumstantial evidence and relied heavily on the testimony of Carter's cousin, Ms. Leary, who claimed she saw Defendant among the group of males dressed in all black walking near the scene fifteen minutes prior to the shooting. According to Defendant, Ms. Leary "admitted she did not see anyone's face," but "claimed that Hamilton approached her after being shot and said, "he shot me, he shot me, Zay shot me" before collapsing and dying. Although Ms. Leary noted that Defendant was known as "Zay," Defendant argues "Zay" could have meant "they," as there were at least four boys who ran from the scene. Additionally, Defendant notes there was no evidence connecting him to the earlier shooting in the morning that allegedly led to the later shooting. Defendant also contends Ms. Leary had a willingness to lie for the benefit of Hamilton and Carter because she "had already lied" to law enforcement earlier that day regarding the first shooting. Therefore,

5

Defendant argues the evidence was insufficient to prove he actively contributed to the shooting of victims Carter and Hamilton.

## The State's Position

The State argues that the evidence presented was sufficient to prove that Defendant was guilty of two counts of principal to second degree murder. The State asserts that the jury believed the testimony of Ms. Leary, who identified Defendant as one of the individuals seen prior to the shooting and testified that victim Hamilton stated, "Zay shot me." The State further contends as the trier of fact, the jury's evaluation should not be disturbed and prays Defendant's convictions be affirmed.

*Jurisprudence*

The analysis for insufficient evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); State *v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The testimony of a single witness, if believed, and absent internal contradictions or irreconcilable conflicts with physical evidence, is sufficient to support a conviction. *State v. Pierre*, 14-1071 (La.App. 3 Cir. 5/6/15), 170 So.3d 348, *writ denied,* 15-1151 (La. 5/13/16), 191 So.3d 1054.

6

This court has stated the following regarding appellate review in cases relying on circumstantial evidence:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10−11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826−27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, 583 U.S. 950, 138 S.Ct. 392 (2017).

In the present case, the jury unanimously found Defendant guilty of two counts of principal to second degree murder. Second degree murder involves "the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm." La.R.S. 14:30.1(A)(1). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Draughn*, 05-1825, pp. 7−8 (La. 1/17/07), 950 So.2d 583, 592−93 (citations omitted), *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007).

Moreover, La.R.S. 14:24 defines principals as "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit

the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime. . . ."

In *State v. Petty*, 12-278, p. 11 (La.App. 5 Cir. 10/30/12), 103 So.3d 616, 623, the court stated:

> Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state, and the mental state of one defendant may not be imputed to another defendant. Thus, mere presence at the scene of a crime does not make one a principal to the crime. However, it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention. *State v. Page,* 08–531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449, *writ denied,* 09–2684 (La.6/4/10), 38 So.3d 299.

*The Evidence Detailed*

Detective James Rauls ("Detective Rauls") of the Bunkie Police Department testified that on January 19, 2022, he investigated multiple incidents that occurred at 110 North Knoll Street in Bunkie, Louisiana, one in the morning and another at dusk. According to Detective Rauls, the shootings at dusk involved Defendant. Thereafter, Detective Rauls testified regarding his knowledge of gangs and the connection between gangs and the victims' deaths. Detective Rauls stated:

Q: What are the names of those gangs?

A: The one that stands out, is the one that call[s] themselves, Three World.

Q: Now does Three World have any type of calling card or color designation that their members wear?

A: Uh, may I explain . . . it.

Q: Absolutely.

A: Understanding gang culture, gangs typically follow the same doctrine. They identify themselves with tattoos and colors. They [are] selective on members that they choose. They demand loyal[ty] to the gang above all, above that person[']s family, loved ones or whom his

significant other may be. They demand this loyalty to the gangs. It's a violent initiation to get in and it's a violent initiation to get out if you're allowed to get out. These gangs identify themselves . . . so other gangs can really identify them[;] they wear certain colors. With Three World, they wear the colors black and red. They are not following the doctrine that everybody knows like Crips and Bloods. Crips wear all blue, Bloods wear all red. They refuse to pronounce . . . like Crips refuse to pronounce the letter C . . . I mean, the letter B. Bloods refuse to pronounce the letter C. Gangs in Louisiana [don't] follow the national trend, they are more like homegrown, it's neighborhood guys that grew up together that tend to formulate these organizations that eventually thrive into gangs, and they protect territory and above all respect is the utmost for a gang. If you disrespect them, there's a price to pay. They are not scared of the police, and they are not scared to go to jail.

Q:      With that being said, there's a Three World gang in Bunkie, correct?

A:      That's correct, sir.

Q:      Are there any other rival gangs in Bunkie?

A:      There are rival gangs in Bunkie. You had one that was just recently disintegrated, they called themselves the Bentl[e]y Boys.

Q:      When you say disintegrated, how do they disintegrate?

A:      They were arrested, killed, you know, things of that nature which brought down their membership. So, they do exist, but they are not as prevalent as other little factions that are within the Bunkie boundaries.

Q:      Would you consider the Three World gang to still remain prevalent in Bunkie?

A:      Yes, we still have open cases with these alleged gang members committing violent crimes.

Q:      Do you have any information that the defendant Exzavian Burnette is a member of any gang in Bunkie?

A:      Yes, he affiliates himself with Three World.

Then, Detective Rauls discussed the events of January 19, 2022. According to Detective Rauls, there were two shootings: one in the morning and one at dusk.

Regarding the morning shooting, Detective Rauls stated:

A:      What we found out, because we got the whole incident on a neighbor[']s video camera, there's an altercation, a verbal altercation

between Devonte Pierre[,] Mr. Dontavious Pierre[,] and Kevin Armstrong as well as Dalton Hamilton, [and] Delvonte Carter.

Q:      And Delton Hamilton and Devondre Carter are the victims in this particular case, correct?

A:      That's correct, they [are] brothers[,] and they are [the] victims.

Q:      Can you tell us what your investigation revealed?

A:      What we saw on the video we were able to ascertain was, these four guys get into a, basically a verbal altercation and the altercation is basically between Dalton Hamilton and Devontarious Pierre. Well, he comes down to the driveway of 110 North Knoll and they're arguing and without warning Carter comes out the house and he starts shooting at Pierre, Devontraious Pierre. As he [ ] Pierre and let's understand that Pierre and Armstong are brothers, as they retreated down the street Carter is shooting at them. Pierre is subsequently struck in the left wrist. He sustains a bullet wound to the left wrist and at first[,] [t]he two girls that were present who were Lashon Fulton and Tanikwa Stevens said that…

        . . . .

Q:      You can go on with your response Mr. Rauls.

A:      We questioned two witnesses that [were] there that morning at the time of the shooting which were the girlfriends of Hamilton and Carter. They initially stated that Devonte Pierre was the aggressor, once we looked at the video it was determined that he wasn't the aggressor at the time, it was Hamilton and Carter [who] were the aggressors. The nature of the feud is basically narcotic related, once again this is determined when you're dealing with gangs and disrespect comes into play. Pierre[,] who's a member of the Three World gang is shot by the opposition, Carter. So, this started the course of events sort of speak, it started the ball rolling.

Q:      So, [would] the shooting of the member of the Three World gang be considered as disrespect?

A:      It is.

Q:      It is common based on your experience with gangs that disrespect, demands retaliation?

A:      Yes, it [does]. Disrespect is one of the golden rules that they, all these gangs formulate themselves on I want to be the baddest [sic], we want to be the baddest [sic] group and if we're disrespected, we have [to] retaliate to basically [e]nsure our dominance over everyone else that's trying to be at opposition toward our gang.

Q:     So, the morning shooting, the person that was shot . . . I [am] sorry, I didn't get his name, what was his name?

A:     The person who [was] shot was Dontavious Pierre.

Q:     Pierre.

A:     Yes.

Q:     Do you have any information as to whether or not Mr. Pierre was friends with Exzavian Brunette?

A:     Yes, he was interviewed, and he admitted that they are friends.

Next, Detective Rauls discussed the night shooting, stating:

A:     I started receiving calls from the then Chief Scotty Ferguson, saying that there was a second altercation at the Knoll Street residence. I was currently out of town, so it took me some time to get to the actual scene.  Once I got there it was pretty chaotic, but what had happened was there was a shooting.  Hamilton was shot multiple times and . . . let me see . . . he was immediately extracted from the area by family members to try to save his life at Bunkie [General Hospital]. . .

Q:     And if you don't mind[,] could you say what you said, Hamilton, could you say the full name?

A:     I'm sorry, Dalton Hamilton.  He was immediately placed into a vehicle and extracted from the area.  They brought him to Bunkie General[,] [but] a few minutes after arriving at Bunkie General[,] he succumbed to his wounds.  By the time the responding police officers got there Dondravion Carter, he was lying in the driveway by 110 North Knoll, he was bleeding profusely, they worked with him tried to save his life[,] but he eventually succumbed to the wounds he sustained in the previous gun battle that took place.

        . . . .

A:     As I was saying, both of the girlfriends had the same testimony. She said they were in Carter's vehicle[,] which was a white utility vehicle.  They had gotten together, they went to the store, bought some snacks, on the way back they passed a group of guys, approximately five guys dressed in black, you know on Floyd Street.  Carter slows down, of course they had the window down and they stare at one another, both the girls say it was an awkward feeling there, they don't say anything to one another, but they stare at each other and as they passed the group of males, one of the males says something that they can't really identify what he said.  They said they got to the house on 110 Knoll Street they backed the utility into the driveway, and I guess as a social thing for them, they smoked a blunt, which is a cigar

11

containing marijuana and they shared it between the four of them. As they were doing so . . .

Q:      Not to interrupt you, but when you say the four of them, who are you refer[ing] to?

A:      I'm referring to Dalton Hamilton, Devondre Carter[,] [ ] Lashon Fulton[,] and Teniwka Stevenson.

Q:      And just for the record, is [Lashon] Fulton a girlfriend or the mother of the defendants . . . of the victims?

A:      Girlfriend . . .[ ] Lashon Fulton is?

Q:      Is the mother?

A:      Is the mother?

Q:      Just to make sure?

A:      Okay, my apologies, I'm thinking she's the girlfriend, you know so. Well anyway, they're smoking a blunt together, these guys, group of guys pass by and about a minute or two after they pass by the dog that they had tied in the backyard he's barking like crazy, they ignore it at first, this goes on for a minute or two, so the two brothers[,] Hamilton and Carter[,] decide to get out of the vehicle and back and investigate why the dog is barking [the] way he is. As they walk through the back part of the carport to see what the dog is barking at, this is when they were ambushed, sort of speak and the gun battle erupted. We had that on video, of course the neighbor[']s camera, it picks up, you can see the light of the gun fire but you can't tell who was firing[,] so we were able capture that and you see both brothers running from the back carport area, [one] collapses on the driveway[,] which was Hamilton, and Carter is actually tending to him because it was his brother, and he knew he was shot, he was saying he was shot and these things, so they immediately rushed him off from the area, as they were driving off[,] this is when Carter collapses and they discover[ed] that he's struck multiple times and this is where when the responding officers got there, this is where they find Carter.

        . . . .

Q:      You can answer. Is there [ ] any significance in a stare down, for lack of better term?

A:      Based on my experience with gangs once you start staring at them that's a form of . . . it's obviously a bad thing if [they] are opposite, if [they're] opposing each other. One thing when they stare down each other it's a form of disrespect, it's showing that, you know, I'm not going to back down off of you, you don't frighten me and same thing. So, it's the terminology in a gang word as dissing, they are

dissing one another. They both, both sides got their chest poked out and that just means, do what you going to do I'm going to do what I'm going to do. So that's what the stares mean.

Q:     Where did your investigation go after you interviewed these girls?

A:     After that we interviewed [ ] [Ms.] Leary and she had something, her [recount] of what happened, she had a bit more information to give.

Q:     The information that [Ms.] Leary provided to you, is that what ultimately led to the arrest warrant of Mr. Burnette?

A:     That's correct.

On cross-examination, Detective Rauls stated that everyone affiliated with Three World gang was considered a suspect in the case, including Desmond Pierre, the father of Dontavious Pierre and a Three World gang member. Detective Rauls also testified that throughout the investigation, the stories regarding the shooting changed. Detective Rauls said:

A:     At first, they said Devontavious Pierre got into it an argument with the two brothers and he tried to shoot at the two brothers, but that was [ ] by video[,] and it is shown that although they were arguing that Carter initiated the shooting that morning.

Q:     And who were those witnesses that told you that?

A:     The two witnesses that told us that [were] Fulton and Stevenson.

Q:     Okay, so Lashon Fulton, the mother of Delton Hamilton and Devondre Carter and then Stevenson, who is she?

A:     Girlfriend.

According to Detective Rauls, Hamilton and Carter had loose ties to the Bentley Boys.

Next, Officer Michael Grisom ("Officer Grisom") of the Bunkie Police Department testified that he was one of the first officers to arrive on scene after the second shooting. According to Officer Grisom, there were two people on the ground, a black male who appeared to be suffering from gunshot wounds and a

female who appeared to be having a seizure. There were also "people running around screaming."

Afterwards, Officer Grisom discussed the evidence that was recovered at the scene:

> Q: Was there any evidence that you recovered at the scene?
>
> A: Yes ma'am, on the house, facing the house to the right hand side where one individual stated that the attacker, or the suspects [had] come around. I found a pair of black house slippers. I found in the back toward the back of the house there were several shell casings, bullet fragments[,] and unfired cartridge and then toward the street there [were] more shell casing[s] located, and marked, and tagged and photographed.
>
> Q: Was a gun recovered at the scene?
>
> A: Not at that time, no ma'am.
>
> Q: Were you able to determine what type of ammunition recovering fragments and so forth, were you able to determine what type of gun was used at the scene?
>
> A: According [to] the shell casings it was a, there was a lot [of] nine millimeter casing[s] out there.
>
> Q: Any other types of casings?
>
> A: Not that I can recall, no ma'am. There might have been some 40's but I think the biggest percentage of them were nine millimeters.
>
> Q: And when recovering these items, do you know with any certainty when they were fired?
>
> A: That I don't know ma'am. I don't know that much about the ballistics in the time frame of that, but I mean as far as, they were fresh shell casings, because there was no dust on them, there was no [rain] on them. They were very new casing[s] to be [on] the ground. They were still shiny and had the, you know, [be]cause we had rain and everything else and if they'd been out there for a short period of time there would have been rain on them and dust or something like that.

Officer Grisom further testified that he had went to the location of the shooting earlier that day to talk to the victims regarding a shooting that occurred that morning.

According to Officer Grisom, Hamilton and Carter were suspects in the earlier shooting.

Next, Dr. Christopher Tape ("Dr. Tape"), an expert in the field of forensic pathology, testified. Dr. Tape stated he performed autopsies on victims Hamilton and Carter. Dr. Tape stated Hamilton sustained a single gunshot wound on the left side of his chest. According to Dr. Tape, the bullet punctured his heart and lungs, which caused blood to seep through his airways. Dr. Tape determined Hamilton's cause of death to be a "gunshot wound to body at chest" and the manner of death to be "homicide." Regarding Carter's autopsy, Dr. Tape testified he had three gunshot wounds: one on his left chest, one on his left hip, and one on his lower left leg. According to Dr. Tape, Hamilton's body was riddled with gunshot wounds that damaged multiple bones and organs in Hamilton's body; these wounds eventually caused blood to trickle through his airways and caused his death. Dr. Tape concluded Carter's cause of death was "gunshot wounds to body and lower extremity" and his manner of death was "homicide."

Lastly, Ms. Leary, Carter's cousin, testified. Ms. Leary stated she was with victims Carter and Hamilton on the night of the shooting. According to Ms. Leary, she arrived at their house around 5:30 p.m., and then she, the victims, and the victims' mother, Lashon Fulton, went to the store to pick up some medicine at Parrino's Drug Store. On their way home, they saw four males dressed in all black walking in the neighborhood. Ms. Leary testified Defendant was among the group of males, as "he was the only one who looked back" at them after Delton Hamilton flashed his lights. Ms. Leary did not get a chance to see anyone else's face.

Thereafter, Ms. Leary discussed the shooting, stating:

Q      And what happened after that?

A: We parked in the yard, I went in the house, I came back out to talk to my cousin Jamie and fifteen minutes later . . .

. . . .

A: Fifteen minutes later I walked back outside and Devondre and [they] had walked to the back of the house . . .

Q: I'm sorry to interrupt you, but when you say Devondre and Delton, this is very important, who's Delton?

A: Devondre and Delton.

Q: Okay, Devondre [Carter] and Delton [Hamilton] where were they?

A: They got out the car, they walked to the back of the house that was next to theirs and I heard gunshots firing and I just saw the same four people running after the shots [were] fired.

Q: The same four people that you saw when you arrived back at the house at 110 Knoll Street?

. . . .

Q: What four people did you see?

A: The same four people that I saw when we [were] arriving [at] the house.

Q: And why do you say it was the same people?

A: Because they had on the same clothes.

Q: And where did you see them at?

A: At the end of the other driveway, by the house next [to] theirs.

Q: Okay, what did they do whenever you saw them?

A: After the gunshots they took off running.

Q: Could you recognize anybody's face out of the four people that you saw?
A: No, not then it was just the same colors.

Q: Okay, now [initially] when you pulled up to 110 Knoll Street you were able to identify someone, correct?

A: Yes, sir.

16

Q:     And who was that?

A:     Exzavian.

Q:     Whenever you initially pulled up, what were they wearing, what color, what clothes were they wearing?

A:     All black, like black jacket and black pants.

Q:     And the second time you saw them, what were they wearing?

A:     The same.

Q:     Whenever you got back from Parrino Drug Store, and you went inside, were you the only one that went inside?

A:     Yes, sir.

Q:     Did Delton and Devondre stay outside?

A:     Yes, sir.

Q:     What made you come back outside?

A:     Because my cousin Jayla told me to come outside.

Q:     Okay, and when you walked outside who did you see?

A:     Like . . .

Q:     Was Devondre and Delton still in the driveway, were they still there?

A:     Oh, yes sir.

Q:     And did they stay there?

A:     Yes, sir.

Q:     At any point did they leave or go in the back yard?

A:     They got out the car and they went to the back of the house that was on the side of theirs.

Q:     Do you know why they went back there?

A:     No, sir.

Q:     And you heard gunshots?

A:     Yes, sir.

17

Q:      What did you do after that?

A:      I had ran the opposite way, to the pole and I came back.

Q:      You ran in the opposite direction?

A:      Yes, sir.

Q:      Did you see what Delton and Devondre were doing?

A:      No, sir.

Q:      At some point did you decide to come back to the residence?

A:      Yes, sir.

Q:      Did you see anybody whenever you were coming back to the residence?

A:      Uh, I saw the four boys running and then that's when Delton ran towards me.

Q:      Delton was running towards you?

A:      Uh hum.

Q:      Where was he at?

A:      Running from off side of the house, that was on side of his.

Q:      Okay, and where were you?

A:      Getting close back to the driveway.

Q:      Did you see Delton also?

A:      Yes, sir.

Q:      Where was he?

A:      Running from off side of the house.

Q:      Okay, I'm sorry, I'm making you confused.
A:      Yes, sir.

Q:      Where was Devondre or did you even see Devondre?

A:      He was still on the side the house whenever Delton ran towards me.

Q:      Did you know if he had been shot?

18

A:      No, sir.

Q:      Did Delton say anything to you?

A:      Yes, sir

Q:      What did he say?

        . . . .

Q:      Okay, just so we're clear on what my question is, I'm going to back up a little bit.  After the shooting, correct me if I'm wrong, you ran in the opposite direction?

A:      Yes, sir.

Q:      Why was that?

A:      Because I heard the gunshots.

Q:      Were you scared?

A:      Yes, sir.

Q:      At some point you decided to return to the residence, correct?

A:      Yes, sir.

Q:      And you saw . . . who did you see?

A:      I saw the four guys running and Delton running towards me.

Q:      Did Delton say anything to you?

A:      Yes, sir.

Q:      What did Delton say?

A:      He [says], he shot me, he shot me, Zay shot me.

Q:      Okay . . .

A:      And he collapsed after that.

Q:      Did he die after that?

A:      No, sir.

Q:      It is difficult to hear you, I'm going to ask you again, and please speak up because everyone has got to hear you.  What exactly did Delton say?

19

A: He [said], he shot me, he shot me, Zay shot me and then he collapsed after that.

Q: Did he die after that? Did the police come after that, did he remain on the ground?

A: He remained on the ground.

Q: Did you have any other further conversations with him?

A: No, sir.

Q: You indicated previously that you've known Exzavian Burnette your entire life, correct?

A: Yes, sir.

Q: Have you ever known anyone to refer to him as Zay?

A: I mean, they been calling him that.

Q: Okay, who's they?

A: Like the people in school, like I've been knowing him since I was in elementary, so.

Q: Would it be fair to say he's commonly called Zay?

A: Yes, sir.

Q: Are you friends with Exzavian Burnette?

A: I mean, I was.

Q: Did you refer to him as Zay?

A: Yes, sir.

On cross-examination, Ms. Leary stated she went to the victims' house that afternoon to be with family. According to Ms. Leary, she and Lashon Fulton, the victims' mother, were cousins. Ms. Leary testified when she got to the victims' home, Lashon, Delton, Devondre, Devondre's girlfriend, and Delton's girlfriend were there. Delton's girlfriend, Tylina, stayed at the house while they went to the store. Ms. Leary then discussed the events that occurred after they left the store, stating:

Q:     And you're on your way back to the house and you see some people in the road?

A:     Yes, sir.

Q:     What were [they] doing besides just walking?  Were they doing anything else besides just walking?

A:      No, sir.

Q:     They were all dressed in dark clothes, you said like black, right?

A:     Yes, sir.

Q:     Then you went in the house and some time passed, you said about fifteen minutes, is that right?

A:     Yes, sir.

Q:     So, during those fifteen minutes you didn't see those people again?

A:     No, sir.

Q:     Then you said you came outside and there [were] gunshots, right?

A:     NO VERBAL RESPONSE.

Q:     And you said you saw some people running from the house afterwards ... I got a little confused earlier about that, you said that...

       . . . .

Q:     You saw some people running from the house, correct?

A:     Yes, sir.

Q:     Okay. I got a little confused on your testimony earlier, when you came outside, is that when you . . .  like when the gunshots happened, is that when you saw the people running?
A:     No, I had came outside before Delton and them got out of the vehicle.

Q:     Okay.

A:     And I was standing at the end of the road talking to my cousin Jayla and . . .

Q:     Who is your cousin?

21

A:     Jayla.

Q:     Jayla, now how did she get there?

A:     She had drove there, she had told me to come outside to talk to her.

Q:     Okay, so she drove up while you were inside and you start talking to her?

A:     Yes, sir. Then that's when Devondre and Delton got out the car and went on the side of the house next to theirs and I heard the gunshots, I ran towards the other way and ran back. I saw the four people running, same clothes and Delton ran towards me.

Q:     Okay, so let me back up. You were in front of the house where the driveway is, right?

A:     Yes, sir.

Q:     Okay, so in front of the house and your cousin is in the vehicle still at the road?

A:     Yes, sir.

Q:     Delton and Devondre, they were in the back of the house and that's where the shooting happened?

A:     Yes, sir.

Q:     Where do you run from that point?

A:     The opposite way.

Q:     Away from the house?

A:     Yes, sir.

Q:     Okay, and its [your] testimony that you saw people running from the house at that point?

A:     Yes, sir.

Q:     How could you see to the back?

A:     Because it's like, it's an open way, like you can see it.

Q:     Okay, how can you be sure that it's the same people?

A:     Because they had on the same clothes.

Q: It's all black clothes, right?

A: Yes, sir.

Thereafter, Ms. Leary testified further on cross examination regarding the statement she made to the police. Ms. Leary acknowledged that although she told Detective Rauls prior to them going to the police station that victim Hamilton told her that "Zay shot him" before collapsing, the recorded statement given by her to the Bunkie Police Department did not contain that declaration. Nevertheless, Ms. Leary testified that when she made her statement at the police station she could "barely remember everything."

*Analysis*

The record shows that the State presented evidence, that if accepted by the jury, demonstrated Defendant's affiliation with Three World gang, placed Defendant near the victims' home approximately fifteen minutes prior to the shooting, and identified Defendant as one of the shooters. Although Defendant argues the evidence was circumstantial, we find that a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. Moreover, although Defendant relies on the absence of Ms. Leary's recitation of Hamilton's dying declaration during her in-house statements to the police, the jury heard that testimony and made a credibility determination. The jurisprudence has consistently held it is not this court's function "to assess the credibility of witnesses or to reweigh the evidence." *State v. Barton*, 22-642, p. 4 (La.App. 3 Cir. 2/15/23), 357 So.3d 907, 912 (citing *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442). As such, we find that the State presented sufficient evidence to prove beyond a reasonable doubt that Defendant was guilty of two counts of principal to second degree murder.

Accordingly, Defendant's counseled assignment of error lacks merit.

23

## PRO SE ASSIGNMENT OF ERROR NO. 1

### Defendant's Pro Se Argument

Having challenged the sufficiency of the State's evidence in his counseled assignment of error, Defendant contests the admissibility of certain evidence in his two pro se assignments of error. Specifically, Defendant argues the State presented "inadmissible hearsay, without a valid, firmly rooted exception to the hearsay rule" and "used perjured testimony to secure a conviction in violation of due process of law." According to Defendant, the State disguised the statement made by victim Hamilton, wherein he identified Defendant as the shooter, as a dying declaration exception to the hearsay rule. However, Defendant contends the dying declaration exception does not apply because the statement was never mentioned in the interview with the Bunkie Police Department, never referenced in the police report authored by Officer Michael Grisom, and never stated during the direct and cross-examination of Detective James Rauls, one of the lead detectives on the case.[3]

*Hearsay Hearing*

Before evidence was adduced at trial, the State presented its motion to introduce hearsay testimony before the court. At the hearing, the trial court listened to the testimony of Ms. Leary, who allegedly heard victim Hamilton state, "he shot me, he shot me, Zay shot me" before his death. The State claimed Hamilton's statement was a dying declaration. In response, Defendant's attorney stated:

> I don't disagree with [the State] based on what Ms. Leary said today. The requirements is [sic] that the statement must relate to [the] cause or circumstances of the declarant believed to be his impending death which is true and that he believed that death was imminent, because he was just shot and fell down right when he said it, then it would file [sic] under a dying declaration. So, I do not disagree with that, what I would ask is that, during the trial that, once they lay a foundation to that, that we just have…I'll object because it will be hearsay and then you can say based on a previous hearing, we decided this [is an exception] to the hearsay rule[.]

---

[3] The State did not file a response to Defendant's pro se assignments of error.

At the conclusion of the hearing, the trial court granted the admission of the hearsay testimony, stating:

> Based upon the evidence presented at the hearing today, this Court finds that the declaration made by Delton Hamilton on January 19, 2022[,] when he said, ["]he shot me, he shot me, Zay shot me["], qualifies as an exception to the hearsay rule under Article 804b.2. The circumstance of the statement indicates that the statement was made by the [declarer], Mr. Hamilton believing that his death was imminent. [It] certainly concerns to the cause of circumstances or what is believed to be his impending death, he fell in the street immediately after or at the same time is [sic] making these statements and his death was shortly thereafter. The declaration is admissible as evidence in these proceedings and as an exception to the hearsay rule.

As stated above in his response to the State's argument at the pre-trial hearing, although defense counsel agreed with the propriety of the State's argument in support of its proposed use of the hearsay testimony, Defendant's attorney objected at trial to Ms. Leary's testimony regarding Hamilton's dying declaration. Nevertheless, based upon its earlier pre-trial determination, the trial court overruled Defendant's objection at trial.

*Evidentiary Procedural Issue: Pro se Error No. 1*

> Louisiana Code of Criminal Procedure Article 841 states, in pertinent part:
>
> A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
>
> . . . .
>
> C. The necessity for and specificity of evidentiary objections are governed by the Louisiana Code of Evidence.
>
> Louisiana Code of Evidence Article 103 states, in pertinent part:
>
> **A. Effect of erroneous ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> **(1) Ruling admitting evidence.** When the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection[.]

25

In *State v. Ruiz*, 06-1755, p. 8 (La. 4/11/07), 955 So.2d 81, 87, the court stated:

> Louisiana's contemporaneous objection rule provides "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." La.Code Crim. Pro. art. 841 A; *State v. Knott*, 05-2252, p. 2 (La.5/5/06), 928 So.2d 534, 535. The contemporaneous objection rule has two purposes: (1) to require counsel to call an error to the judge's attention at a time when the judge may correct the error; and (2) to prevent defense counsel from "sitting on" an error and gambling unsuccessfully on the verdict, and later resorting to appeal on an error that might have been corrected at trial. *Knott*, 05-2252 p. 2, 928 So.2d at 535; *State v. Arvie*, 505 So.2d 44, 47 (La.1987).

> It is well settled that an error cannot be availed of after verdict unless it was objected to at the time of the occurrence, and the party objecting made known to the court the action which he desired the court to take, or his objection to the action of the court and the grounds therefor. *State v. Baylis*, 388 So.2d 713, 721 (La.1980).

As an accessory to that well-established jurisprudence, "[A] party may not expressly agree to an adverse ruling, even on a written motion, and subsequently complain that the ruling was error." *State v. Butler*, 30,798, p. 32 (La.App. 2 Cir. 6/24/98), 714 So.2d 877, 894, *writ denied*, 98-2217 (La. 1/8/99), 734 So.2d 1222.

In the present case, the transcript shows that Defendant's counsel acquiesced to the statement being a dying declaration when he stated at the pre-trial hearing that he did not disagree with the State. Nevertheless, as previously noted, Defendant's counsel did object to Ms. Leary's testimony at trial. Thus, it appears counsel was attempting to have it both ways. As shown in *Butler*, such action is disallowed because Defendant's counsel acquiesced to the statement being a dying declaration. Therefore, we will not consider Defendant's pro se assignment of error number one.

## PRO SE ASSIGNMENT OF ERROR NO. 2

### Defendant's Argument

Defendant argues Ms. Leary's statement at trial was a "lie" and the State knew the statement was false but failed to correct it. To support his argument, Defendant cites to *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173 (1959), wherein the United

States Supreme Court reversed the defendant's conviction based upon the State's failure to correct an important witness's false testimony. Again, Defendant relies on the fact that the statement was never mentioned in the interview with the Bunkie Police Department, never referenced in the police report authored by Officer Grisom, and never stated during the direct and cross-examination of Detective Rauls, one of the lead detectives on the case. As such, Defendant argues his conviction should be reversed, set aside, and remanded to the trial court for a new trial.

*Analysis*

Our review of the transcript shows there is no evidence that reveals the victim's dying declaration to Ms. Leary was false. Accordingly, we find that Defendant's reliance on *Napue* is misplaced. Although Defendant argues that Ms. Leary's testimony about the victim's dying declaration was "false" because she never mentioned it in her interview with the Bunkie Police Department and it was neither referenced in the police report nor stated during Detective Rauls' testimony, the jury had the benefit of all the above-referenced evidence as it considered the credibility of Ms. Leary and deliberated the Defendant's guilt. Under *Barton*, 357 So.3d 907, 912, is it not this court's function "to assess the credibility of witnesses or to reweigh the evidence[;]" that determination is in the hands of the jurors who listened to the witnesses, watched their demeanor, and assessed their veracity. Therefore, we find Defendant's second pro se assignment of error lacks merit.

**DECREE**

For the foregoing reasons, Defendant's convictions and sentences are affirmed. Additionally, the trial court is directed to inform Defendant, Exzavian Burnette, of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate

written notice to him within ten (10) days of the rendition of this opinion and to file written proof that Defendant received the notice in the record of the proceedings.

**CONVICTIONS AFFIRMED. SENTENCES AFFIRMED. REMANDED WITH INSTRUCTIONS.**